## ERIE R. CO. v. SCHULTZ.

(Circuit Court of Appeals, Sixth Circuit. January 3, 1911.)

No. 2,067.

1. RAILROADS (§ 330*)—ACCIDENTS AT CROSSINGS—CONTRIBUTORY NEGLIGENCE —EFFECT OF MAINTAINING GATES.

A man driving a loaded wagon about to cross several parallel railroad tracks at a crossing where safety gates are located and in operation, and who has waited before a closed gate until a passing train has gone by, and for whom the gate has been lifted so that he may cross, does not still continue under the same absolute duty to look and listen as soon and as far as physical obstacles permit, which he would have borne if the crossing had been unguarded; but he discharges his legal duty if, under those circumstances, he uses his senses of sight and hearing for his protection as soon as, and as far as, a man of ordinary prudence would do under similar circumstances.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1071–1074; Dec. Dig. § 330.*]

2. RAILROADS (§ 350*)—ACTION FOR INJURY AT CROSSING—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Evidence considered in an action against a railroad company to recover for an injury to plaintiff by being struck by an engine while driving a heavily loaded wagon over a crossing on defendant's road after the gates had been lifted for him to pass, and held not to establish his contributory negligence as a matter of law.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.*]

3. RAILROADS (§ 350*)—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

Where the plaintiff is urging a heavily loaded team across a railroad track, and in the presence of clear negligence by the railroad company, a conclusive legal presumption of contributory negligence should not be based on a safety margin of ten feet of distance or two seconds of time between the heads of his horses and the train, when plaintiff could first see the train.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 350.*]

4. TRIAL (§ 207*)—INSTRUCTIONS—PURPOSE AND EFFECT OF EVIDENCE.

Where, on cross-examination of a witness for plaintiff, defendant's counsel had him identify and admit his signature to a written statement previously signed by him, and it was then agreed between counsel for both parties and the court that the entire statement should go in as evidence, defendant was not thereafter entitled to an instruction that the jury should consider the statement only as affecting the credibility of the witness.

[Ed. Note.—For other cases, see Trial, Dec. Dig. § 207.*]

In Error to the Circuit Court of the United States for the Northern District of Ohio.

Action at law by August Schultz, as guardian of John Balke, against the Erie Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Cushing, Siddall & Palmer, for plaintiff in error.

Skiles, Green & Skiles and R. B. & A. G. Newcomb, for defendant in error.

---

Before WARRINGTON and KNAPPEN, Circuit Judges, and DENISON, District Judge.

DENISON, District Judge. After the first trial of this case, the railroad company (hereinafter called the defendant) brought the case to this court, and the judgment which had been rendered below for Balke's guardian (hereinafter called plaintiff) was reversed in an opinion by Judge Severens, upon the ground that the question of plaintiff's contributory negligence had not been properly submitted to the jury. 173 Fed. 759, 97 C. C. A. 573. The general facts are fully stated in the former opinion.

Upon the second trial, the plaintiff again recovered a judgment, and the defendant has again brought the case here, upon the grounds hereinafter stated. Upon the second trial, the jury was instructed, in effect, that, if the gates were standing erect while Balke was waiting for the freight train to pass, this would be notice to him that the gates were not being operated, and their upright position would not amount to an invitation to him to cross; and inasmuch as he did not, after the freight train moved by, stop to look or listen, his contributory negligence would be clear, and he could not recover. The verdict of the jury, therefore, goes upon the theory and amounts to a finding that the gates were being operated, and that they were down and closed before him as he was waiting for the freight train to pass, and that they were then raised before him, thus permitting him to proceed across the tracks. Under these circumstances, and as a part of the situation controlled by this finding, defendant, by its requests numbered 6 and 7, asked the trial court to say that, "under the circumstances of the case," there was on Balke's part an absolute duty to look and listen, as soon as his head came clear of, and beyond, the obstructions, so that he could see down the track; and that if, had he done so, he would as a matter of fact have had knowledge of the approaching engine in time for him to have avoided the accident, then the plaintiff could not recover. One of these requests pertains to looking, after passing all obstructions, and one pertains to looking and listening, after passing certain obstructions, but the distinction is not now important. Both assume the existence of an absolute duty.

The court refused these requests, and charged the jury that Balke could not recover unless, while crossing, and notwithstanding the lifting of the gates for him, he was exercising ordinary care for his own safety; that there would be a distinction between the state of mind and the consequent conduct of one crossing where there were no gates and one crossing where the gates had been lifted for him to cross, but that even in the latter case he must not assume that the place is safe, and must still exercise ordinary care, and must use his senses of sight and hearing to do those things for his own safety which men of ordinary prudence are accustomed to do under similar circumstances; that the lifting of the gates in a certain sense lulls the person about to cross into a sense of security, but this must not be an absolute sense of security; that he must still exercise ordinary care for his own safety; and that it was for the jury to say whether he did exercise that kind

of care which men of ordinary prudence are accustomed to exercise under such circumstances.

The case, therefore, seems now to present the clear question whether a man, driving a loaded wagon, about to cross several parallel tracks, at a crossing where safety gates are located and in operation, and who has waited before a closed gate until a passing train has gone by, and for whom the gate has been lifted so that he may cross, still continues to carry the same absolute duty to look and listen, as soon as and as far as physical obstacles permit, which he would have borne if the crossing had been unguarded; or whether, on the other hand, he discharges his legal duty, if, under those circumstances, he uses his senses of sight and hearing for his protection as soon as and as far as a man of ordinary prudence would do under similar circumstances.

We think the latter rule is the one properly to be drawn from the decisions upon this subject, and that the instruction of the court to this general effect, was correct.

At ordinary railroad crossings, not protected by flags or gates, the highway traveler's usually imperative duty to look is not removed merely by the presence of obstacles to his vision. It is only suspended and does not attach to him until he reaches a point where he can look to advantage; but then, unless for some peculiar reason, it does attach in full force. This is exactly the rule of conduct invoked as an absolute rule in this case by requests 6 and 7; and to have granted them would have been to ignore the whole effect of the invitation conveyed by the raising of the gates. If a flagman beckons the waiting team driver to come ahead, or if a tower man raises the lowered gates, in either case, there is a representation to the driver that there is no approaching train within striking distance. The driver who moves forward under this representation cannot be held to the same strict rule of instant and constant and extreme vigilance which is enforced against one who crosses in sole reliance on his own judgment.

In some jurisdictions, it has been held that the failure of the gateman to lower his gate, or of the flagman to give the stop signal, amounts only to the absence of a special and extraordinary precaution which the railroad company might have taken, and has little or no bearing upon the rule of contributory negligence (Greenwood v. R. R., 124 Pa. 572, 17 Atl. 188, 3 L. R. A. 44, 10 Am. St. Rep. 614; Swanson v. R. R., 63 N. J. Law, 605, 44 Atl. 852); but the more general holding is that the rule is modified by such facts (Pa. Co. v. Stegemeier, 118 Ind. 305, 20 N. E. 843, 10 Am. St. Rep. 136; Conaty v. N. Y., etc., Co., 164 Mass. 572, 42 N. E. 103; Glushing v. Sharp, 96 N. Y. 676; Richmond v. Ry. Co., 87 Mich. 374, 49 N. W. 621; Central Trust Co. v. Wabash Co. [C. C.] 27 Fed. 159, Treat, D J.; C. & N. W. Ry. v. Prescott [8th Circuit] 59 Fed. 237, 8 C. C. A. 109, 23 L. R. A. 654). Even in Pennsylvania the supposed strict rule seems to have been relaxed. Roberts v. D. & H. Co., 177 Pa. 183, 35 Atl. 723.

In this court it has been distinctly recognized that the opened gate is in the nature of an invitation to cross, and that the presence of such fact in the case generally makes the question of contributory negli-

gence one for the jury, and that the same degree of watchfulness cannot be expected from the driver of a loaded wagon as from a pedestrian. Blount v. R. R., 61 Fed. 375, 9 C. C. A. 526. So far as this point is concerned, there is a measure of analogy (although not complete) between a highway traveler who is by invitation crossing a railroad track, and a passenger who in the act of leaving the station is by invitation crossing the track; and in the latter situation this court has held that the person crossing does not carry the imperative duty at all events to look and listen, saying:

"The right to rely on the care and caution of the company furnishes some reason for the failure to exercise that high degree of care which one is bound to exercise when his safety depends wholly upon his own watchfulness." Lurton, C. J., in Graven v. MacLeod, 92 Fed., at page 851, 35 C. C. A., at page 52.

And see C. & O. Ry. v. King, 99 Fed. 251, 40 C. C. A. 432, 49 L. R. A. 102.

There is not in the decision of the majority of the court in U. P. R. R. Co. v. Rosewater, 157 Fed. 168, 84 C. C. A. 616, 15 L. R. A. (N. S.) 803, anything inconsistent with the view above expressed. The decision is to the effect that the rule of invitation does not go to the extent that the person crossing need take no care for his own protection, unless he is confronted by danger, "known, obvious or threatening"; and in discussing the underlying question the court says:

"But when the traveler has performed his full duty in that respect, and has driven upon the crossing at the invitation of a flagman stationed there by the railroad company to assist in the prevention of accidents, whether, in addition to his attention to the guidance of his vehicle, he should continue to look to the right and to the left, is a more doubtful proposition. He is then in a position of possible peril, and, in view of the various emergencies likely to arise, just what particular precaution he should take is not so clear and plain as to justify its prescription as a definite, fixed rule of conduct. Were it otherwise, the doing of the very thing prescribed might lead to disaster. The measure of care and caution to be observed in such cases should be more adjustable to the particular conditions and emergencies, and is that active watchfulness which ordinarily prudent men would adopt under like circumstances; and the question whether the driver fell short is one for the jury."

In spite of the fact that, as we think, the traveler, crossing under circumstances like those shown by this record, is not bound absolutely and at all events to look both ways on the very instant when he comes clear of the obstructions, still his failure to use his eyes and ears might, under some circumstances, be so clearly not the conduct of a prudent man that a verdict would be directed against him, but in the present case this question was rightfully left to the jury.

It is true that requests 6 and 7 embody a part of the language found in one sentence of the opinion of this court on the former trial; but we do not think that this language, used in the course of stating the argument leading to the conclusion reached, was intended to decide the present question, which was not then distinctly before the court.

The defendant also urges that it was entitled to a peremptory instruction to find in its favor, because the undisputed facts showed contributory negligence. The same position was urged when the case

was here before, and was overruled, and we do not think the record now is materially different. Giving its greatest weight to the testimony for plaintiff, the jury might have concluded that at the instant when Balke could first have seen down the track for any distance his horses' heads, in their forward travel, had reached a point within a few feet, perhaps even within six feet, of the point where they would be struck by the passing engine then only one hundred feet away. Under such a state of facts, it cannot be said as a matter of law that a man exercising ordinary prudence must have seen the approaching engine in time so that he could have stopped and kept clear of the danger zone. On the other hand, we think it not impossible that an ordinarily prudent man, having received this invitation to cross, might not have observed the engine until such a moment that it would be natural for him to do as Balke did, viz., whip up his horses and try to get across.

Considering this question, the train which had just passed forms an element of the situation. One witness says that the caboose of the freight train formed an obstacle interposed between Balke and the oncoming engine until Balke's horses were actually on the track. It may, be, as defendant urges, that this is physically impossible, and that the caboose must have passed by an appreciable distance so as not to form an additional visual obstacle; yet the facts that it had just passed and that Balke's attention might be distracted thereby and that it might have tended to cause noise and confusion would all be circumstances proper to be considered in deciding whether he must, if exercising due care, have seen the engine in time to have stopped. Even discarding the extremest testimony for plaintiff, and adopting the statement made by defendant's counsel in their brief, the horses' heads were 10 feet from the danger line at the point where, as counsel say, Balke must have seen the engine. His horses would cover this distance, advancing at the stated rate, in less than two seconds. Where the plaintiff is urging a heavily loaded team across a railroad track, and in the presence of clear negligence by the railroad company, a conclusive legal presumption of contributory negligence should not be based on a safety margin of ten feet of distance or two seconds of time.

Defendant also complains of the refusal to give its request numbered 8, pertaining to a question of evidence. Plaintiff's witness Broughton had, before the trial, signed a written statement. Upon his cross-examination defendant's counsel caused the witness to identify this statement and admit his signature. At a later point in the trial, when defendant had the case, defendant's counsel read this statement to the jury, saying, "I desire to read, for the purpose of contradicting the testimony of Samuel Broughton, the statement that has been referred to"; and after reading the statement, further said, "I use this merely as contradictory." The court was requested to charge that "the written statement of the witness Broughton is not to be regarded by you as evidence in the case, but only for the purpose of affecting the credibility of his testimony given you from the witness stand"; but failed so to charge.

Regardless of what might be thought as to whether the request was properly formulated in saying broadly that the statement was not evidence, or as to whether the error, if any, in refusing the charge would have been prejudicial, we think the circumstances under which the statement was first received made the request improper. When the paper was identified, defendant's counsel queried whether he should call witness' attention to specific statements. Counsel said: "We want it all in." The court said: "Then it may be all in as evidence." Defendant's counsel commented, "Very well." A few moments later, this colloquy occurred: "Plaintiff's counsel: The understanding is this goes in? The Court: Yes. Plaintiff's counsel: The entire statement? The Court: Yes."

This occurred while Broughton was on the stand, and the court below might well have thought it justified plaintiff's counsel in supposing that the statement was in evidence generally, and that he therefore might excuse the witness without bringing out the facts recited in this statement. Under such circumstances, defendant's counsel could not, by stating that he read the statement only for a qualified purpose, prevent plaintiff's counsel from having advantage of the general admission which had already occurred.

The assignments of error cannot be sustained, and the judgment must be affirmed